UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| CHRISTOPHER HOLDER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STACY M. SAUNDERS, et al., ) <br> ) <br> Defendants. ) <br> ) | Civil No. 13-38-ART <br><br> **MEMORANDUM OPINION AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Christopher Holder, previously an inmate[1] at the United States Penitentiary—Big Sandy, alleges that the defendant, staff psychologist Stacy Saunders, failed to protect him from an attack by A.T., a fellow inmate with a mental illness and history of violence. *See* R. 1 at 1–7. In its previous opinion, the Court identified Holder as a white male. Relying in part on that fact, the Court denied Saunders' motion for summary judgment on Holder's deliberate-indifference claim. *See* R. 33 at 4–8. Saunders now asks the Court to reconsider its previous order under Federal Rules of Civil Procedure 59(e) and/or 60(b). *See* R. 40-1. According to Saunders, Holder is in fact a black male. *Id.* The Court agrees that the evidence from the Bureau of Prisons identifies Holder as a black male, but the Court concludes that a reasonable jury could still find that Saunders was deliberately indifferent to the substantial risk of harm posed by A.T.

---

[1] According to the Bureau of Prisons website, Holder was released from prison on September 19, 2014. *See* Federal Bureau of Prisons, "Find an inmate," http://www.bop.gov/inmateloc/ (last visited Dec. 8, 2014).

**I. The Court Grants the Motion to Reconsider as to Holder's Race.**

Saunders' motion to reconsider focuses on Rule 59(e) and Rule 60(b) as the possible avenues for the Court to revisit its previous order. Rule 59(e) allows a party to file "[a] motion to alter or amend a judgment" within 28 days of the entry of judgment. Fed. R. Civ. P. 59(e). Rule 60(b), as is relevant here, states that a court "may relieve a party . . . from a final judgment, order, or proceeding" for reasons including "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b). Saunders' motion also mentions Rule 54(b) as another route for reconsideration. *See* R. 40-1 at 1. That Rule lets the district court "revise[] at any time" its order before it adjudicates all the claims in the case. Fed. R. Civ. P. 54(b). For the reasons discussed below, Rule 54(b) and Rule 59(e), not Rule 60(b), are the appropriate Rules for the Court to use in this case.

Rule 60(b) is not the proper procedural vehicle for Saunders' motion because it applies only to a "final judgment, order, or proceeding." The denial of summary judgment is not a final judgment or order, even though denials of qualified immunity may be appealed as an interlocutory order. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that a district court's denial of qualified immunity on summary judgment "is an appealable 'final decision' . . . notwithstanding the absence of a final judgment"); *Alkire v. Irving*, 330 F.3d 802, 809 n.5 (6th Cir. 2003).

Rule 59(e)'s scope is a little more ambiguous. It applies to "a judgment," which Rule 54(a) defines as "a decree and any order from which an appeal lies." It is true that the denial of qualified immunity is an appealable interlocutory order. *See Mitchell*, 472 U.S. at 530. While not a final judgment, the denial of qualified immunity could constitute "a judgment" under Rule 54(a) because a party may appeal from that order. *Id.* Under that view, the

Court's previous order would be subject to Rule 59(e). But courts have interpreted Rule 59(e) as encompassing reconsideration of only final judgments. *See Cockrel v. Shelby Cnty. School Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001) ("Motions for reconsideration filed within ten days of the district court's final judgment . . . are generally treated as a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e)."); *Russell v. GTE Gov't Sys. Corp.*, 141 F. App'x 429, 436 (6th Cir. 2005) ("[T]here was no final judgment when the court entertained GTE's motion for reconsideration, so the strictures of Rule 59(e) did not apply.").

Even if Rule 59(e) were not the appropriate method for reconsideration, "district courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008) (internal quotation marks omitted). Rule 54(b) further clarifies that an order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties." Fed. R. Civ. P. 54(b). This type of order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.* Because the Court has not entered a judgment adjudicating all the claims in this case, it may still revisit its earlier order pursuant to its inherent powers.

The Court need not determine which course best serves this case. Whether the Court proceeds under Rule 59(e) or under its inherent powers through Rule 54(b), the Court may reconsider its prior order if there is a clear error or a need to prevent a manifest injustice. *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (inherent powers); *Leisure Caviar, LLC v. U.S. Fish and Wildlife Serv.*, 616 F.3d 612, 615

(6th Cir. 2010) (Rule 59(e)); *see also Doe v. Patton*, 381 F. Supp. 2d 595, 605 (E.D. Ky. 2005).

Saunders contends that the Court must revisit its denial of summary judgment and enter judgment for Saunders because the Court misconstrued Holder's race. Holder, according to Saunders, is black, not white. Saunders points to several prison records listing Holder's race as black. *See* R. 25-3 (Public Information Inmate Data); R. 25-5 (Bureau of Prisons Health Services Clinical Encounter); R. 25-6 (Memorandum Regarding Inmate Assault In C-4 Unit). The Bureau of Prisons' website also lists Holder as a black male. *See* Federal Bureau of Prisons, "Find an inmate," http://www.bop.gov/inmateloc/ (last visited Dec. 8, 2014). Holder's response is that "[g]overnment records clearly describe Holder as biracial." R. 44 at 2. Holder, however, does not cite to any specific records, and no Bureau of Prison documents filed in this case list him as biracial. Nor does Holder elaborate on what races make up his allegedly biracial listing. Holder has also not presented evidence of his race in his declaration. *See* R. 30-1.[2] Accordingly, the Court will proceed with the constitutional inquiry assuming that Holder is black.

## II. Holder's Claim Against Saunders Survives Summary Judgment.

To succeed on his failure-to-protect claim, Holder must satisfy two elements: (1) that Holder was incarcerated under conditions posing an objectively substantial risk of serious harm, and (2) that Saunders acted with "deliberate indifference" to the risk of that harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). At summary judgment, the Court views the evidence in the light most favorable to Holder as the nonmoving party. *Scott v. Harris*, 550

---

[2] In his declaration, Holder states that A.T., immediately before attacking Holder, said that he "just found out" that Holder was a "white boy." R. 30-1. Holder does not rely on A.T.'s statement as evidence of his race.

U.S. 372, 378 (2007). If, after viewing the evidence from that perspective, the Court determines that a reasonable jury could find for Holder, the Court must deny the motion for summary judgment. *Cordell v. McKinney*, 759 F.3d 573, 579–80 (6th Cir. 2014). While the Court's previous order focused on Holder's race in deciding the failure-to-protect claim, removing race from the equation is not fatal to his claim.

Both prongs of the inquiry turn on the mental-health condition of Holder's attacker, A.T. Almost all the relevant information regarding A.T.'s mental health comes from Saunders' notes of her appointments with A.T. *See also* R. 33 at 4–5 (Court's previous order).

Saunders' notes and the other record evidence demonstrate that A.T. had a history of mental health problems and susceptibility to violence. *See, e.g.*, R. 27-1 at 1, 3–4. When A.T. arrived at Big Sandy, officials labeled him a "psych alert" inmate,[3] in part because of a previous violent assault and its "relation to his paranoia and evidence of a delusional belief system." *Id.* at 1, 25. While Big Sandy's chief psychologist Terry King concluded in the initial screening evaluation that A.T. had no significant mental health problems, *id.* at 1, A.T.'s later appointments would reveal a different story.

According to Saunders' notes from her first appointment with A.T., on September 26, 2011, A.T. told Saunders that he had "special abilities" to "detect the world around me better than the next guy." *Id.* at 3 (quoting A.T.). Those "abilities" allowed A.T. "to pre-emptively strike out against others who might seek to harm him." *Id.* And A.T. was fond of those

---

[3] Terry King's declaration explains that psych-alert status is used "to identify inmates that require extra care when their housing is changed or they are transferred." R. 27 at 2 n.1. King cites to the Federal Bureau of Prisons Program Statement on "SENTRY Psychology Alert Function," which states that the program applies to inmates with "substantial mental health concerns." R. 27-7 at 1. The purpose of the program is to "track[] and monitor[]" inmates to "ensur[e] continuity of care," as well as to "[i]mprove[] staff and inmate safety as a result of monitoring inmates whose mental illness increases the risk of impulsive or aggressive behavior." *Id.*

5

special powers: He had resisted requests from other psychologists to take antipsychotic medications because he believed they were "jealous" and wanted to remove or weaken his special powers. *Id.* at 4.

A.T. also disagreed with previous psychological evaluations describing him as "explosive" because, as he explained to Saunders, he engaged in violence only "after he has gathered sufficient information from the voices and his special sensing ability." R. 27-1 at 4. Saunders also wrote that A.T. told her that he "began to rely on the[] [voices] more and more" after "they became so helpful to him." *Id.* The voices also affected his relationships with the inmates and staff. In some situations, A.T. acknowledged, people were "hurt unnecessarily based on faulty information." *Id.* He also had "a lot of negative interpersonal interaction" because A.T. believed inmates would say his name to "mess[]" with him, which they would later deny. *Id.* at 3. He told Saunders those problems would make him "agitated and hostile." *Id.* After this meeting, Saunders concluded that A.T. should remain on psych alert due to his "untreated symptoms" which could "evidence behavioral disturbance based on delusional/hallucinatory content." *Id.* at 4. She scheduled a follow-up appointment two weeks later.

A.T. missed the follow-up meeting scheduled for October 11, 2011, and Saunders rescheduled him for October 13, 2011. R. 27-1 at 5. In that meeting, A.T. reiterated that he did not want to lose his "special powers." *Id.* at 6. When Saunders suggested A.T. take medication, A.T. explained that voices were telling him that Saunders had forced him to take medication, even though that was not true. *Id.* Saunders kept A.T. on psych alert after this meeting and scheduled an appointment two weeks later. *Id.* at 7.

The next entry in the record is another missed appointment, on November 15, 2011. R. 27-1 at 8. Saunders rescheduled the appointment for November 21, 2011. The notes from that session are brief, and indicate only that A.T. "presents as agitated and hostile today." *Id.* at 9. Even though Saunders scheduled the next appointment 90 days later, she saw A.T. twice in December because of a lockdown. *See id.* at 10–11. On both of those visits, Saunders went to see A.T. at his living unit "to check his mental status." *Id.*

In their next meeting, on January 17, 2012, A.T. presented "with marked agitation." R. 27-1 at 12. He told Saunders that prison officials were trying to "double-cell" him, and he would do "all in my power to protect and defend myself from extremist and infiltration." *Id.* A.T. continued to warn Saunders that "[t]he first thoughts I hear of or threatening to me will be repelled with maximum force and velocity!" *Id.* Saunders noted that A.T. was "focused on racial and persecutory themes" during the appointment. *Id.* At the end of her summary, Saunders explained that A.T.'s "[i]mpulse control appears to be limited" and that his "magical delusional thinking" affected his behavior. *Id.*

On February 6, 2012, Saunders revised A.T.'s status, though she had not seen him since the January 17, 2012, appointment. R. 27-1 at 13; R. 27-4 at 3.[4] She upgraded A.T. to a higher care level because of his "psychotic symptoms consistent with a diagnosis of Schizophrenia." R. 27-1 at 13. Due to concerns about "his presentation and history of violence," Saunders wrote that A.T. would be seen monthly in the department. *Id.*; *see also* R. 27-4 at 3 (Saunders Declaration) ("I noted that [A.T.] would have monthly clinical

---

[4] Saunders' motion for summary judgment contends that she saw A.T. on February 6, 2012. R. 25-1 at 5. Her notes from that day do not mention actually meeting with A.T., and the title of her entry is "General Administrative Note." R. 27-1 at 13. When Saunders had meetings with A.T., she titled her notes "Clinical Intervention – Clinical Contact." *See, e.g.*, *id.* at 3–12. Given that evidence, a reasonable jury could find that Saunders did not meet with A.T. on February 6, 2012.

7

contacts with Psychology Services."). Saunders also entered a "Treatment Plan" on that same day, which stated that A.T. "will meet with psychology staff as scheduled at a minimum of [once] every 12 weeks." R. 27-1 at 18. While these facts are in some conflict, the Court views the discrepancy in the light most favorable to Holder. From that perspective, Saunders was supposed to meet with A.T. monthly.

Instead of seeing A.T. monthly, however, Saunders did not see him again until after he attacked Holder on May 7, 2012, in the C-4 housing unit. *See* R. 27-1 at 19–21. Between January 17, 2012, and May 7, 2012, A.T. missed two appointments. *See id.* at 19, 20. After failing to show up for his second appointment, on March 1, 2012, Saunders did not schedule A.T. for another appointment later that week, or even later that month. Rather, Saunders set A.T.'s appointment for "10–12 weeks" later—middle to late May 2012. *Id.* at 20.

The next meeting between Saunders and A.T. was on May 7, 2012, after A.T. assaulted Holder. In that meeting, A.T. told Saunders that his "powers of protection helped me again," and that "the threat was intractable, so I acted with swiftness and velocity." R. 27-1 at 24. During that session, Saunders wrote that A.T. "has a history of assaultive behavior toward others," including a 2006 assault charge while incarcerated, and a "history of incident reports for weapon possession" while at Big Sandy. *Id.* at 25. Because of A.T.'s attack on Holder, Saunders "request[ed] [A.T.'s] transfer to a more appropriate facility." *Id.* As explained below, taking all those facts in the light most favorable to Holder, a reasonable jury could conclude that Saunders' treatment of A.T. constituted deliberate indifference to the risk A.T. posed to the inmates on his housing unit.

### A. A Jury Could Conclude That Holder Was Imprisoned Under Conditions That Posed an Objectively Substantial Risk of Serious Harm.

The first prong of the failure-to-protect analysis is commonly referred to as the objective component. To satisfy this objective component, "the deprivation alleged must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). In a failure-to-protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). The Sixth Circuit has also added that the risk must not be "one that today's society chooses to tolerate." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotation marks omitted).

There is some tension in Sixth Circuit case law on how to frame *Farmer*'s objective inquiry. In one set of cases, the court looks only at whether the inmate suffered a sufficiently severe injury. *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). For example, the inmates in *Curry* filed a failure-to-protect claim because of beatings by a prison guard. *Id.* at 497–98. The Sixth Circuit held that the injuries suffered by the prisoners at the hand of the guard were enough to satisfy the objective prong of *Farmer*. *Id.* at 506. In other cases, the Sixth Circuit examines whether there was an objectively substantial risk of harm to the inmate before the injury occurred. *See Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *see also Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("To satisfy th[e] [objective] prong, a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur."). In *Bishop*, the risk of harm to the inmate was serious enough where

the inmate was young, small, and mentally ill, and he was bunked with a predatory cellmate. 636 F.3d at 766. That court did not rely on the injuries actually suffered by the inmate.

The latter formulation—evaluating the risk of harm before the alleged injury—is more consistent with *Farmer*'s directive to identify a "substantial risk." 511 U.S. at 834. Though *Farmer* cited *Helling v. McKinney* for that proposition, *Helling* could actually be understood to support *Curry*'s version of the objective prong—examining whether the injury was sufficiently severe. *See Helling*, 509 U.S. at 35. *Helling* held that a prisoner did not have to show a current, actual harm to satisfactorily allege an Eighth Amendment claim. *See id.* ("We thus reject petitioners' central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment."). Rather, the prisoner could succeed on the objective factor by showing that he had been "exposed to unreasonable risk with respect to his future health." *Id.* at 36. One reading of *Helling* is that it *expanded* the objective prong by allowing a prisoner to satisfy its requirements by proving either an actual injury or a substantial risk of injury.

The Court need not resolve the inconsistency because Holder succeeds under either inquiry. Holder certainly suffered a sufficiently serious actual injury. A.T. attacked him with a homemade weapon, leaving Holder "bleeding from multiple wounds" with injuries to his right eye, head, neck, hands, and ankle. R. 25-5; R. 25-6 at 2. Like in *Curry*, Holder's injuries from an attack suffice to establish an objectively serious deprivation under the Eighth Amendment. 249 F.3d at 506.

Looking at the risk of harm before the attack, and viewing the facts in Holder's favor, Holder was housed in conditions that posed a substantial risk of serious harm—the sort of harm that society does not tolerate. *See Villegas*, 709 F.3d at 568–69. Though A.T. had not

seen a psychologist in almost four months, he had unrestricted access to Holder in the C-4 Unit on the day of the attack. R. 30-1 at 1. In A.T.'s last documented visit before the assault, he had threatened to strike out against anyone who threatened him. R. 27-1 at 12. But as Saunders knew well, A.T. did not wait for actual threats to emerge. Instead, by using his special powers, A.T. believed that he could "feel[] when he [would] be searched or confronted by others" because he could "get the thoughts of others in his head." *Id.* at 3 (internal quotation marks omitted). A.T. would then rely on these special warnings to "pre-emptively strike out against others." *Id.* He admitted that others had been "hurt unnecessarily" because of what the voices told him. *Id.* at 4. A.T. also resisted taking any antipsychotic medications, as they might take away his special powers. In addition to his mental illness, A.T. had at least one previous assault in 2006 and a "history" of weapons possession since his arrival at Big Sandy. *Id.* at 25. A reasonable jury could conclude that A.T., with an untreated severe mental illness that made him prone to random attacks of violence, posed an objectively substantial risk of harm to inmates that he had access to on his housing unit.

### B. A Jury Could Conclude That Saunders Was Deliberately Indifferent.

A jury could also find that Saunders was deliberately indifferent to the substantial risk that inmates present on A.T.'s housing unit, including Holder, faced from A.T. The subjective prong of the Eighth Amendment calculus requires a showing that Saunders had "a sufficiently culpable state of mind." *Curry*, 249 F.3d at 506 (quoting *Farmer*, 511 U.S. at 834). A prison official is liable only if she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. But, if the official is unaware of a substantial risk of harm, then the official is not liable for an Eighth Amendment violation.

11

*Bishop*, 636 F.3d at 767. Put another way, an official is deliberately indifferent if she is aware of facts from which she could infer that a substantial risk of serious harm exists, and she draws the inference, but then does nothing to prevent the harm. *Farmer*, 511 U.S. at 837; *Curry*, 249 F.3d at 506.

This case flips the traditional deliberate-indifference inquiry. Instead of looking at whether the official knew of a substantial risk to a particular inmate's safety, the Court looks at whether she knew that the aggressor-inmate posed a threat to a certain group of inmates. *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). From that perspective, an official may be liable "where a specific individual poses a risk to a large class of inmates," even where "the particular prisoner at risk is not known in advance." *Id.* Thus, the "correct inquiry is whether [an official] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995).

*Greene* is instructive here. The prisoner, Traci Greene, was a preoperative transsexual who was placed in the prison's protective custody unit ("PCU") for her safety. While in the PCU, another inmate, Hiawatha Frezzell, assaulted Greene. *Id.* at 292. Greene then brought a deliberate-indifference claim against the warden. The district court granted the warden summary judgment solely on the basis that the warden did not know of a substantial risk of serious harm to Greene. *Id.* at 293. With regard to the warden's knowledge, the Sixth Circuit explained that Greene could survive summary judgment in one of two ways: (1) she could demonstrate that the warden was aware that her vulnerability as a transsexual placed her at a substantial risk in the PCU, or (2) she could introduce evidence that the warden was aware that "Frezzell's placement in the PCU without segregation or

other protective measures presented a substantial risk to other inmates in the PCU." *Id.* at 294.

The second inquiry identified in *Greene* is relevant to this case. Under that framework, Greene offered sufficient evidence from which a reasonable fact finder could determine that the warden was aware that Frezzell posed a substantial risk to the inmates of the PCU. Frezzell had a "lengthy prison misconduct record"; the warden admitted that Frezzell was a "predatory inmate" who had an institutional history of violence; and Frezzell was a maximum-security inmate. *Id.* at 294–95. Based on those facts, the Sixth Circuit held that Greene created an issue of fact regarding the warden's knowledge of her risk. While the court also concluded that Greene demonstrated an issue of fact because of her status as a vulnerable inmate, the court's opinion viewed each ground as an independent and sufficient way to defeat summary judgment. *Id.* at 293–94.

A jury could find that Saunders, like the warden in *Greene*, had actual knowledge of the substantial risk of harm that A.T. presented to the inmates that he had access to on his housing unit. Her notes contain a litany of facts (discussed above) showing her awareness of information from which she could infer that risk, and that she actually drew the inference. Saunders knew A.T. heard voices, which could lead him to engage in violent acts against others. *See generally* R. 27-1. A.T. told her that he had unnecessarily hurt people based on the urging of these voices. *Id.* at 4. Saunders was aware that A.T. had a weapons assault violation while in prison and a history of weapons possession at Big Sandy.[5] *Id.* at 25. After her January appointment with A.T., in which he warned her that he would "repel[] with

---
[5] Even though Saunders' reference to the weapons possession appears in her notes only after A.T.'s attack on Holder, there is no evidence to suggest she learned of that information on that day and not before. Viewed in the light most favorable to Holder, Saunders had knowledge of those incidents throughout her treatment of A.T.

13

maximum force and velocity" any threats, *id.* at 12, Saunders revised her diagnosis, *id.* at 13. In that revision, Saunders explained that A.T. presented with psychotic symptoms consistent with schizophrenia. *Id.* at 13. She noted his marked agitation and refusal to take medication. *Id.* Finally, because of "his presentation and history of violence," Saunders decided to see A.T. "monthly." *Id.* As the Court concluded in its previous order, "Saunders appreciated that all was not well with A.T," R. 33 at 6, and a reasonable jury could find that she knew of the substantial risk A.T. posed to the other inmates on his housing unit.

A jury could similarly conclude that Saunders disregarded that risk. Viewing the facts in Holder's favor, Saunders did nothing once A.T. stopped showing up to appointments. Even though Saunders scheduled A.T. for monthly visits, she would not see A.T. until his attack on Holder on May 7, 2012—close to four months after their last appointment. In the meantime, A.T. missed at least two appointments. While Saunders had rescheduled A.T.'s earlier missed appointments within a matter of days, she rescheduled his last missed appointment for 10 to 12 weeks later—all while knowing that he had recently displayed psychotic symptoms accompanied by threats and that he was unlikely to be taking medication. *See* R. 27-1 at 13, 20.

In addition to not rescheduling A.T.'s appointments sooner, Saunders did not visit A.T. in his living unit, as she had done twice during a prison lockdown in December 2011.[6] Indeed, the record has no evidence of any interactions between A.T. and Saunders between

---

[6] In Saunders' declaration, she explains that an inmate may refuse psychological treatment unless he is "an immediate danger to himself or others or is likely to cause serious property damage." R. 27-4 ¶ 10 (citing Bureau of Prisons Program Statement 5310.12, Psychology Services Manual, Chapter 2 at 7). In the briefing before the Court, Saunders makes no argument regarding A.T.'s right to refuse treatment. Even had Saunders made the argument, it would not change the result. A reasonable jury could still find that Saunders was deliberately indifferent because, after revising A.T.'s status, she rescheduled a monthly appointment three months into the future, did not visit A.T. in his cell over those three months, and did not communicate with any other prison officials about A.T.'s condition.

14

January 17 and May 7, 2012. There is also no evidence that Saunders spoke with other prison staff about A.T.'s condition during this time or took any other preventive action. *Cf. Bishop*, 636 F.3d at 769–70 ("Responding to a risk to an inmate by referring the matter for further investigation or taking other appropriate administrative action may in some cases fulfill an official's protective duties under the Eighth Amendment."). While it is possible Saunders took some undocumented action between January and May, Saunders has not claimed that she did and the Court is not free to speculate about what actions Saunders may have taken. Given the evidence in the record, a reasonable fact finder could determine that Saunders was deliberately indifferent to the substantial risk A.T. posed to the other inmates.

### C. Saunders Is Not Entitled to Qualified Immunity.

Finally, qualified immunity does not allow Saunders to escape liability. The qualified immunity analysis generally contains two prongs: (1) whether the defendant violated a constitutional right and (2) whether the right was clearly established. *Bishop*, 636 F.3d at 765 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Sixth Circuit has occasionally added a third prong: "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 n.2 (6th Cir. 2013) (internal quotation marks omitted). In cases involving an alleged Eighth Amendment violation, the Sixth Circuit has collapsed the three prongs into two prongs because, in that factual context, "the fact that a right is clearly established sufficiently implies that its violation is objectively unreasonable." *Id.* (internal quotation marks omitted); *see also Bishop*, 636 F.3d at 765.

Because a jury could conclude that Saunders violated Holder's constitutional right, the remaining question is whether that right was clearly established. A constitutional right is clearly established where "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In a failure-to-protect claim, the Supreme Court recognized that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks omitted). The Sixth Circuit case law, in line with *Farmer*, holds that "an inmate's right to be free from prison violence" is clearly established. *Bishop*, 636 F.3d at 766 (collecting cases). Due to the broad definition of the clearly established right in *Bishop*, Holder's right to be free from an attack by A.T. was also clearly established. A reasonable jury could find that Saunders violated that clearly established right by her deliberate indifference to the risk A.T. posed to the inmates. *See id.* at 765–66. Because a jury could find for Holder, the Court must deny Saunders' motion for reconsideration as to the motion summary judgment.

Accordingly, it is **ORDERED** that:

(1) Saunders' motion for reconsideration, R. 40, is **GRANTED IN PART** as to Holder's race.

(2) With Holder's race no longer at issue, Saunders' motion for reconsideration, R. 40, is **DENIED IN PART** as to the motion for summary judgment. Saunders' motion for summary judgment, R. 25, is **DENIED**.

This the 16th day of December, 2014.

Signed By:
*Amul R. Thapar* AT
United States District Judge