# *Christopher Holder v. Stacy M. Saunders*
## Case No.: C.A. No. 7:13-CV-038-ART-EBA

# Expert Report by Robert D. Morgan, Ph.D.

## EXECUTIVE SUMMARY

On May 7, 2012, Inmate A (i.e., the plaintiff) was allegedly attacked by Inmate B while incarcerated in the United States Penitentiary Big Sandy (USP-Big Sandy). During this incident the plaintiff suffered multiple wounds and physical injury. The plaintiff alleges that Inmate B's treatment provider, Dr. Stacy M. Saunders (Federal Bureau of Prison [FBOP] Staff Psychologist), Dr. Terry King (Chief Psychologist), and the warden at FBOP-Big Sandy were negligent in their care of Inmate B such that they exhibited disregard and indifference to the risk of violence presented by Inmate B, and which subsequently resulted in the physical injuries incurred by the plaintiff.

A review of Inmate B's treatment records indicated he was transferred to USP-Big Sandy on approximately September 8, 2011. Upon arrival he was evaluated by Dr. Terry King (Chief Psychologist at USP-Big Sandy). Inmate B was determined to be a "psych alert" inmate prior to his transfer secondary to an assault on another inmate at his prior facility. Dr. King referred Inmate B for follow-up care by a staff psychologist. It is my opinion that the duty of care for Inmate B was transferred to Dr. Saunders upon her initial contact with Inmate B.

Inmate B was seen by Dr. Saunders 7 times over an 8 month period of time. One of these sessions occurred after Inmate B was placed in segregated housing pending investigation for his assault on the plaintiff. During the 8 month period of time, Inmate B did not attend 5 scheduled appointments. Specifically, he was scheduled or seen on the following dates:

September 8, 2011 (Dr. Terry King)
September 20, 2011 (Dr. Stacy Saunders; Inmate did not attend)
September 26, 2011 (Dr. Stacy Saunders)
October 11, 2011 (Dr. Stacy Saunders; Inmate did not attend)
October 13, 2011 (Dr. Stacy Saunders)
November 15, 2011 (Dr. Stacy Saunders; Inmate did not attend)
November 21, 2011 (Dr. Stacy Saunders)
December 23, 2011 (Dr. Stacy Saunders; cell side during facility lockdown)
December 27, 2011 (Dr. Stacy Saunders; cell side during facility lockdown)
January 17, 2012 (Dr. Stacy Saunders; seen per inmate written request)
February 21, 2012 (Dr. Stacy Saunders; Inmate did not attend)
March 1, 2012 (Dr. Stacy Saunders; Inmate did not attend)
May 7, 2012 (Dr. Stacy Saunders; post inmate assault on Inmate A)

Over the course of these sessions, Inmate B's presentation vacillated between cooperative and responsive to agitated and hostile, with oppositional attitudes and evidencing significant deficits in mental status functioning. It is my clinical opinion that this pattern of varied presentation was suggestive of psychiatric decompensation, particularly during Dr. Saunders appointment with the inmate on January 17, 2012. During this session Inmate B noted concern regarding the possibility of him being celled with another inmate to which he stated "They must know that I will do all in my power to protect and defend myself from extremist and infiltration. The first thoughts I hear of or threatening to me will be repelled with maximum force and velocity." Of further concern, he evidenced delusional ideation whereby he believed correctional officers at

USP-Big Sandy were involved in a photograph of a black man being lynched even though the photograph was from a different era. Finally, Dr. Saunders noted that Inmate B evidenced significant mental status deficits. As a result of the inmates decompensated mental health functioning, following this session, Dr. Saunders upgraded Inmate B's level of care to Mental Health Care Level Two. In spite of the inmate's mental health decompensation, verbal threat to the well-being of other inmates, and hostile ideation toward correctional staff, it does not appear that Dr. Saunders notified correctional staff beyond Inmate B continuing to remain on "Psych Alert" status, or took precautions to limit the potential risk Inmate B presented to others (i.e., there is no documentation in the treatment note of any such precaution). Of additional concern, Dr. Saunders' next follow-up appointment with Inmate B was not planned for another 4 to 6 weeks, and following two missed appointments after the session on January 17, 2012, she initiated no further contact. It is my opinion that given the level of risk communicated by Inmate B and the decompensated mental health functioning compared to his presentation in prior sessions, Dr. Saunders' practice fell below the standard of care to protect the welfare of Inmate B or those with whom he had contact.

Dr. Saunders diagnosed Inmate B with Schizophrenia – Paranoid Type, and although it is not atypical for a person diagnosed with schizophrenia to be seen approximately one-time per month (i.e., 7 sessions over an 8 month period), it is questionable practice to have no follow-up contacts with a client with a history of violence who evidenced psychiatric decompensation, and who clearly (verbally) indicated a threat to others if he "sensed" danger. Inmate B clearly presented a danger to others; however, Dr. Saunders documented no precautions to further assess or minimize that risk. This was in spite of the fact that Dr. Saunders was aware of the relevant violence risk presented by Inmate B. This awareness was most clear as Dr. Saunders noted in her last contact with Inmate B, on May 7, 2012, "Staff should be cautious in their interactions with him if he appears agitated and/or hostile. While the prediction of risk to perpetrate violent acts is a difficult venture, Inmate [B] is considered to be at high risk to commit future acts of violence given his psychosis and history." This risk was apparent prior to this treatment contact on May 7, 2012 as Inmate B was agitated and hostile with a history of violence associated with psychosis, amongst other clinical and mental status deficits, observed in her last meeting with Inmate B (i.e., January 17, 2015) prior to his assault on the plaintiff. Given these indicators of violence noted on May 7, 2012, were present on January 17, 2012, it is disconcerting that Dr. Saunders did not conduct a formal risk assessment, and there was no risk prevention plan noted or communicated to staff according to the treatment record. Specifically, it appears that Dr. Saunders did not even conduct an assessment of ideation, intent, or specific plan for violence, in spite of the violence indicators present, although she did such an evaluation for suicide. This discrepancy, given the inmate's history of violence, including an assault that precipitated his transfer to USP-Big Sandy, is particularly disconcerting. Thus, it is my opinion that the absence of a formal assessment of the inmates' risk for violence, implementation of risk prevention plan, or communication of his potential for violence is not consistent with the FBOP policy or generally accepted standards of clinical practice (e.g., IACFP Practice Standards Committee, 2010).

It is further noted that Dr. Saunders did not appear to practice in a manner consistent with FBOP policy regarding the treatment of inmates with mental illness. Specifically, Inmate B refused to sign his treatment plan on February 6, 2012, and Dr. Saunders documented that her treatment

2

plan was to follow-up with Inmate B in "10-12 weeks." This appears to be in violation of policy PS5310.13 Mentally Ill Inmates, Institution Management of which states in Guideline 9: Treatment Compliance, that inmates "deemed to need special attention as a result of a significant mental impairment…shall be interviewed at least monthly to assess his or her level of functioning and need for changes in treatment strategy" (p. 5). Dr. Saunders failed to comply with the expectation that monthly interviews would be conducted to assess Inmate B's functioning. Clearly this is not consistent with policy, and it is my opinion that this deviation from policy and the lack of follow-up fell below the standard of care.

Although it is my opinion that Dr. Saunders assumed the duty of care for Inmate B on September 26, 2011, per FBOP policy, Dr. King maintained supervisory responsibility for the care of Inmate B. Specifically, Chapter 4.3(C)1 states "Each Chief Psychologist is responsible for assessing the treatment needs of the inmate population on an annual basis and for determining what methods of treatment (i.e., individual and/or group psychotherapy) will best meet these assessed needs." Furthermore, per his deposition (June 24, 2015), Dr. King consulted with Dr. Saunders regarding her treatment of Inmate B, and according to Dr. Saunders deposition (June 25, 2015) co-signed at least some of her treatment notes. Therefore, it is my opinion that if Dr. King consulted with Dr. Saunders or reviewed the treatment note she wrote after her session with Inmate B on January 17, 2012 and was aware of the subsequent two missed treatment sessions, as the Chief Psychologist responsible for inmate mental health care, he failed to meet his standard of care by not intervening with Dr. Saunders to facilitate further assessment of Inmate B's risk of violence.

Inmate B's decompensated mental health functioning, verbalization of intent to protect himself from "sensed" harm, and a history of institutional violence, reasonably appears to have caused or contributed to the alleged assault on the plaintiff and attempts to minimize this risk were required by the FBOP policies and the standard of care.

## EXPERT QUALIFICATIONS

I received a Bachelor's of Science (B.S.) degree in psychology (minor in biology) from the University of Nebraska at Kearney in 1991, a Master's of Science (M.S.) degree in clinical psychology from Fort Hays State University (Kansas) in 1993, and a Doctor of Philosophy (Ph.D.) in counseling psychology from Oklahoma State University in 1999. I completed a predoctoral internship in correctional psychology at the Federal Correctional Institution – Petersburg (Virginia) in 1998-1999, and a postdoctoral fellowship in forensic psychology at the Department of Psychiatry, University of Missouri-Kansas City School of Medicine and Missouri Department of Mental Health in 1999-2000. I am a Licensed Psychologist (Texas; #31546) and annually meet the Texas Code of Criminal Procedures (Article 46B) Yearly Continuing Medical Education Requirements ("8 hours of education relating to forensic evaluations").

Currently, I am the John G. Skelton, Jr. Regents Endowed Professor in Psychology at Texas Tech University (TTU). Effective August 17, 2015, I also assumed the position of Department Chair in the Department of Psychological Sciences at TTU. I began my academic career at TTU in 2000 and was promoted to full professor in 2011. During my tenure at TTU, I served as Associate Chair of the Department of Psychology (2003-2004), and Director of Training for the

counseling psychology doctoral program (2005-2007). I was appointed Director of the Institute for Forensic Sciences in 2014. I am also a member of the faculty senate at TTU.

At TTU, I have taught Abnormal Psychology and Forensic Psychology to undergraduate students; however, my primary teaching responsibilities are to graduate students enrolled in the American Psychological Association accredited doctoral programs in clinical and counseling psychology. These courses include Practicum in Intelligence Testing, Advanced Counseling Practicum, and Psychology and Law. These courses are geared toward teaching doctoral students how to conduct cognitive assessments (i.e., teach doctoral students how to administer, score, interpret and report findings from standardized intelligence and cognitive assessments), provide psychological assessments and psychotherapy in diverse clinical settings to include correctional and forensic contexts, and provide doctoral students a foundation in the interface between psychology and law, including topics in forensic psychology, court and judicial testimony, and psychologists' influence in policy legislation.

My research and scholarly activities include treatment and assessment of justice involved persons with mental illness, forensic mental health assessment, and professional development and training issues. My research has been funded by the National Institute of Mental Health, the National Institute of Justice, the Center for Behavioral Health Services & Criminal Justice Research, the Texas Department of Criminal Justice – Community Justice Assistance Division, and the Texas Tech University School of Law.

I have authored or co-authored over 75 articles, book chapters, and reports, as well as three books including the *Clinician's Guide to Violence Risk Assessment*. I am also the lead or co-developer of two treatment programs for justice involved persons with mental illness (*Changing Lives and Changing Outcomes: A Treatment Program of Justice Involved Persons with Mental Illness*), and inmates placed in segregated housing units (*Escaping the Cage: A Mental Health Treatment Program for Inmates Detained in Restrictive Housing*). Notably, I actively engage in research designed to contribute to a best practices model for the provision of mental health services in correctional environments. The overarching goal guiding my research program is to help offenders achieve a higher quality of life that is crime free and that results in increased community safety. In this regard, my work has focused on the investigation of the effects of incarceration on inmates' mental health functioning, and evaluations of effective correctional treatment programming.

From 1993 to 1995, I served as a Mental Health Professional with Prison Health Services at the El Dorado Correctional Facility (EDCF), a "supermax" security correctional facility, and the Winfield Correctional Facility (WCF), a minimum security facility, in the Kansas Department of Corrections (KDOC). My primary assignment at EDCF was to provide mental health services in the institution's administrative segregation housing unit. In this role, I conducted weekly mental health rounds to monitor inmates for decompensated mental health functioning, and I served as a member of the segregation review board. I also provided crisis management services on an as-needed basis. Lastly, I provided psychotherapy services to inmates incarcerated in administrative segregation for various periods of time, including five-to-ten years, in part, to prepare them for release back to the general population. At WCF, I was responsible for all mental health services at the facility including monitoring the mental health functioning of inmates in administrative

4

segregation. As this was a minimum security facility, inmates placed in administrative segregation for disciplinary, mental health, or other reasons remained segregated from the general population for shorter periods of time (i.e., typically less than 30 days).

From 2001 to present, I have operated an independent forensic psychology practice. From 2002 to 2012, I served as the Director of Forensic Services and Director of Postdoctoral Fellowship in Forensic Psychology at the Lubbock Regional Mental Health Mental Retardation Center (LRMHMR) in Lubbock, Texas. I received full medical staff membership during my tenure at LRMHMR. I have completed approximately 900 criminal pretrial mental health evaluations and post-trial criminal risk assessments to include issues of competency to stand trial, criminal responsibility, and criminal risk assessment. I testified in 23 of these cases in state courts in Kansas, Missouri, Oklahoma, and Texas. I am also a mental health consultant to Correct Care Solutions, a private provider of correctional health care services (including mental health care) to correctional agencies across the United States, and recently completed services as an expert witness for the California Department of Corrections and Rehabilitation.

My other professional responsibilities are varied, but still founded in correctional mental health. In 2011, Texas Governor Rick Perry, appointed me to the Advisory Committee to the Texas Board of Criminal Justice on Offenders with Medical or Mental Impairments. I am a Fellow of two divisions the American Psychological Association, and formerly President of Division 18 (Psychologists in Public Service) of the American Psychological Association (2009 to 2010). I co-developed and continue to serve on the steering committee for the North American Correctional and Criminal Justice Psychology Conference, with the first three conferences having taken place in Ottawa and Toronto, Canada, in 2007, 2011, and 2015, respectively. From 2006 to 2011, I was a member of the Mental Health in Corrections Consortium Advisory Board, and in 2008, I served as a consultant to the Justice Center: The Council of State Government for the development of a monograph entitled "*Improving outcomes for people with mental illness under community supervision: A research guide for policymakers*." I served on the editorial boards of two scientific journals, Psychological Services (2002 to 2013) and Criminal Justice and Behavior (2005 to present), as well as an ad hoc reviewer for a number of scientific journals.

My curriculum vitae is attached to this report as Attachment A.

## TESTIMONY, PUBLICATIONS, AND COMPENSATION

Attachment B sets forth a list of cases in which I have provided expert testimony in deposition or at trial over the past four years, publications I have authored in the past ten years, and the compensation for my work in this matter.

## OPINIONS

The opinions I offer in this report are to a reasonable degree of psychological certainty.

## A.  Specific Issues Referred for Evaluation

I was retained to examine the nature and quality of treatment provided to Inmate B by Dr. Stacy M. Saunders, a staff psychologist with the FBOP. It is alleged by the plaintiff (Inmate A) that Dr. Saunders failed to protect him from attack by Inmate B resulting in his (Inmate A) being subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution (see plaintiff complaint).

## B.  Overarching Opinions

Given my investigation to date in this case, I offer the following opinions:

1. Dr. Saunders assumed duty of care for Inmate B during her clinical contact with him on September 26, 2011.

2. Although Inmate B evidenced decompensated mental health functioning to include increased symptoms of psychosis and verbalized plans of violence, over the course of treatment, specifically between September 26, 2011 and January 17, 2012, it does not appear that Dr. Saunders notified correctional staff beyond Inmate B continuing to remain on "Psych Alert" status or took precautions to limit the potential risk Inmate B presented to others (i.e., there is no documentation in the treatment note of any such precaution). Therefore, it is my opinion that given the level of risk communicated by Inmate B and the decompensated mental health functioning compared to his presentation in prior sessions, Dr. Saunders practice fell below the standard of care to protect the welfare of Inmate B or those with whom he had contact.

3. Dr. Sanders did not conduct an adequate assessment of Inmate B's potential for violence to others, in spite of indicators of risk of violence. Furthermore, when Inmate B did not attend follow-up sessions after evidencing decompensated mental health functioning and verbalized threats of violence, Dr. Saunders took no precautions to further assess or minimize that risk. Thus, it is my opinion that the absence of a formal assessment of the inmates' risk for violence, implementation of risk prevention plan, or communication of his potential for violence is not consistent with the FBOP policy or clinical standards of practice (e.g., IACFP Practice Standards Committee, 2010).

4. Dr. Saunders failed to provide psychological services in a manner consistent with FBOP policy and procedures, as well as consistent with professional standards (IACFP Practice Standards Committee, 2010). Thus, it is my opinion that this deviation from policy and the lack of treatment follow-up with Inmate B fell below the standard of care.

5. Per FBOP policy, Dr. King maintained supervisory responsibility for the care of Inmate B, and it is my opinion that if Dr. King consulted with Dr. Saunders or reviewed the treatment note she wrote after her session with Inmate B on January 17, 2012 and was aware of the subsequent two missed treatment sessions, as the Chief Psychologist responsible for inmate mental health care, he failed to meet his standard of care by not intervening with Dr. Saunders to facilitate further assessment of Inmate B's risk of violence.

6.  It is my opinion that Dr. Saunders practice failed to meet the standard of care, which resulted in a causal nexus (i.e., a link between the most probable cause and its resulting effects) for Inmate B's alleged assault on the plaintiff.

## C.  Basis and Reasons for Opinions

The list below identifies the facts and data I considered to prepare this report:

1.  Information provided by Plaintiffs' counsel, including: (a) plaintiffs' Complaint filed in the United States District Court, Eastern District of Kentucky, Southern Division at Pikeville; (b) Plaintiff's Rule 60(b)(2) Motion for Relief from Order; (c) Plaintiff's Supplemental memorandum in Support of Rule 60(b)(2) Motion for Relief from order; (d) deposition of Christopher Holder (Plaintiff); (e) deposition of Stacy Saunders (defendant); (f) deposition of Terry King (defendant); (g) medical records of Inmate B; and the (h) Federal Bureau of Prisons (FBOP) Program Statement: Psychology Services Manual, and PS5310.13 Mentally Ill Inmates, Institution Management of.

2.  My experience and expertise in correctional mental health, including: (a) the provision of psychological services in state and federal correctional facilities, including the provision of psychological services to inmates with mental illness; (b) the development of a therapeutic program for inmates with mental illness; (c) consultation with private and state correctional agencies regarding the provision of mental health services; and (d) my research on prison mental health service provision.

## RESULTS, FINDINGS, AND CONCLUSIONS

## A.  Review of Inmate B's Psychology Treatment Records

Inmate B was transferred to the USP-Big Sandy on approximately September 8, 2011 and was evaluated upon his arrival by Dr. Terry King (Chief Psychologist at USP-Big Sandy). Inmate B was determined to be a "psych alert" inmate prior to his transfer secondary to an assault on another inmate. Dr. King noted that a review of Inmate B's medical records since the assault, at the prior institution, indicated he "did not have a delusional belief system, but rather significant Axis II issues (APD)." It should be noted that "APD" most likely refers to Antisocial Personality Disorder, a diagnosis included in the Diagnostic and Statistical Manual for Mental Disorders (DSM) characterized by a pervasive pattern of disregard and violation of the rights of others. Dr. King referred Inmate B to the "staff psychologist for evaluation and treatment as indicated. Staff will also review the inmate's psych alert status to determine if it should be discontinued."

Inmate B was scheduled for a "follow-up appointment" by Dr. Saunders for September 20, 2015 (Tuesday); however, he did not attend this scheduled appointment. He was rescheduled for "later in the week;" however, he was not actually seen until the Monday of the following week. Inmate B was seen by Dr. Saunders on September 26, 2011. She noted the inmate was agitated at the outset of the session, and he expressed distrust of "Caucasian mental health staff." The inmate reported a history of maltreatment by mental health staff, particularly Caucasian staff whom he

believed attempted to "persecute him." Dr. Saunders noted the inmate reported a "long-standing history of mental illness" and she concluded the inmate presented with "delusional processes and auditory hallucinations." According to the inmate, he can "sense" when others intend him harm (i.e., he can sense the presence of danger), and that he preemptively acts on these senses to protect himself. Although he acknowledged that acting on his senses has resulted in unnecessary injury to others, it is notable that he further stated, "he was only trying to protect himself and that if his special abilities can help save him from danger that he will continue to act on them." Although Dr. Saunders appears to have conducted a thorough mental status examination (see paragraph 5, "A:"); it is not apparent that she conducted a thorough violence risk assessment examining plan, means, or intent of harm to others. Dr. Saunders did determine that Inmate B should remain on "Psych Alert…as he has untreated symptoms and could evidence behavioral disturbance based on delusional/hallucinatory content." The presence or thoroughness of a crisis response plan is not clear from this treatment note beyond informing the inmate "he should contact psychology sooner if his symptoms worsen or he becomes in distress." Dr. Saunders noted she would follow-up with Inmate B two weeks after this initial contact.

Dr. Saunders was scheduled to meet with Inmate B on October 11, 2011; however, the inmate did not present for his scheduled appointment. He was subsequently seen by Dr. Saunders two days later (October 13, 2011). According to Dr. Saunders' treatment note, Inmate B did not attend the scheduled appointment on October 11, 2011 as it interfered with his exercise time. He reported that his morning exercise is essential to "managing the rest of his day," and as a result, Dr. Saunders was very accommodating noting that she would attempt to schedule further appointments later in the day. On October 13, 2011, Dr. Saunders noted the inmate was guarded, and he evidenced confusion and paranoia (e.g., "looks at me suspiciously and goes on to ask me about psychotropic medications and psychiatric referral). Dr. Saunders challenged the inmate's belief system in an apparent attempt to help him understand the difference between perceptual disturbances or delusional processes, and reality (often times referred to as reality testing). She noted in her assessment that the inmate was "not completely oriented to reality." She opined his insight into his current situation and mental status functioning was "limited." Dr. Saunders again noted the inmates' "mental status is remarkable for delusional processes and auditory hallucinations." Although Dr. Saunders noted that Inmate B denied "current suicidal ideation, intent, or plans;" she makes no such note regarding violence potential. Dr. Saunders did note that the inmate's "impulse control appears to be within normal limits." Dr. Saunders again continued Inmate B's "Psych Alert" and with the plan to follow-up with him in 2 weeks.

The next treatment note for Inmate B was submitted on November 15, 2011, approximately 1 month after the prior appointment. Inmate B did not attend this appointment, and Dr. Saunders noted that she would see the inmate later in the week (although it is noted that November 15, 2011 was a Friday). Dr. Saunders did see Inmate B on November 21, 2011, and she noted he presented as "agitated and hostile." Dr. Saunders informed the inmate he could terminate the session, and he did so stating "he did not wish to see psychology at this time and that if he needed something he would let [her] know via cop out." It should be noted that a "cop out" is slang for an inmate's written request for service or assistance. In assessing the inmate, Dr. Saunders noted that his "Behavior is hostile and abrupt. His attitude is oppositional." Psychosis (e.g., delusional ideation, hallucinations) were not present during the course of this apparently brief contact. Dr. Saunders again noted the inmate's "impulse control appears to be within

normal limits." Dr. Saunders continued Inmate B on "Psych Alert" status with follow-up in 90 days. Due to the apparent brevity of the session, it does not appear that Dr. Saunders conducted an assessment of the inmate's potential for violence. Further, the decision to increase his follow-up period from 2 weeks to 90 days is not detailed. It is not clear if Dr. Saunders believed the inmate's agitation, hostility, or oppositional attitudes were the result of mental illness or characterological in nature (such as APD as opined by Dr. King).

Dr. Saunders met "briefly" with Inmate B on December 23, 2011 during a facility lockdown. The purpose of this contact was to "check his mental status." Dr. Saunders noted that Inmate B reported that his psychotropic medication was of questionable efficacy as indicated by his poor sleep. Dr. Saunders noted that the inmate was "open and cooperative," an obvious change from his prior presentation. The inmate was also without indications of "a thought disorder, psychosis, or disturbance of perception." Dr. Saunders noted the plan to follow-up with Inmate B after the facility lockdown is terminated. It is not clear if the Psych Alert status was continued.

Inmate B was again seen by Dr. Saunders on December 27, 2011 during the presumably continued facility lockdown. According to the inmate's report, he was doing well and denied concerns. Dr. Saunders' assessment of the inmate and treatment plan on this date is consistent with her assessment of the inmate and subsequent plan on December 23, 2011 as described above.

Inmate B was seen by Dr. Saunders on January 17, 2012 per his written request. The inmate reported "extreme" sleep disturbance. He was further concerned that staff were considering assigning him a cell mate (referred to as double-celling). In response to this he stated "They must know that I will do all in my power to protect and defend myself from extremist and infiltration. The first thoughts I hear of or threatening to me will be repelled with maximum force and velocity." Dr. Saunders further noted the inmate presented with "marked agitation" with focus on "racial and persecutory themes." During session he presented Dr. Saunders with a photograph of a black man being lynched by white men, who he considered similar to the correctional officers at USP-Big Sandy. Dr. Saunders noted the inmate was "…very emotive, intense and animated in presentation. He is tangential and associations between topics are loose and theme related at best." Inmate B terminated the session after approximately 30 minutes by stating, "I am done" and exiting the office. Significant mental status deficits were noted (agitation including psychomotor agitation, increased energy level, hostile and animated behavior, loud speech, loose associations, mood disturbance, delusional ideation that impacts his behavior, auditory hallucinations, limited impulse control, and limited insight into his mental health functioning). Although this presentation appears to indicate decompensation in Inmate B's mental health functioning, Dr. Saunders did not plan to follow-up with him until 4-6 weeks later. She did maintain him on Psych Alert. There is no indication that a psychiatric referral was made per the inmate's request due to increasing difficulty with sleep, or due to apparent decompensation.

On February 6, 2012 Dr. Saunders "upgraded" Inmate B to "Care 2-mh based on his presentation of psychotic symptoms consistent with a diagnosis of Schizophrenia." Follow-up appointments were to be scheduled on a monthly basis. Dr. Saunders revised the inmate's diagnosis to: Axis I: Schizophrenia – Paranoid Type, and Axis II: Antisocial Personality Disorder. A formal treatment plan was developed with the goals of (1) "Manage symptoms of psychosis and maintain adequate

institutional functioning," and (2) "Inmate will explore feelings of anger and behavioral outbursts." It is unclear how these goals (and accompanying objectives) were to be met as the stated intervention was to meet with the inmate "at a minimum of 1x every 12 weeks for monitoring of symptoms." For example, one objective under goal #2 was that the inmate "will report to staff if he feels that he is a danger to self or others." Given the inmate does not trust staff (as previously noted by Dr. Saunders including the fact that correctional officers were imbedded in his delusional ideation), without treatment focused on helping Inmate B develop this skill, it is unclear how this objective would be met. This is true for most of the objectives identified in the treatment plan. The ineffectiveness of this treatment plan is further evidenced by Dr. Saunders written note that the "Inmate refused (the plan) due to paranoia."

Inmate B was scheduled for a follow-up psychology appointment on February 21, 2012; however, he did not attend this scheduled appointment. He also failed to attend a scheduled appointment on March 1, 2012, at which time he was "rescheduled at this time in 10-12 weeks for monitoring as indicated by his status of Care 2-mh." Notably, a rational for the time interval was not provided in treatment records.

On May 7, 2012 Dr. Saunders was requested to see Inmate B in the Special Housing Unit (SHU; a segregation housing unit) where the inmate was being held pending an investigation of his involvement in a physical altercation with another inmate. Consistent with his statements at the initiation of treatment with Dr. Saunders, Inmate B reported to her on this date that his "powers of protection helped me again." He proceeded to state that he became aware of others plan to harm him, and consistent with his report to Dr. Saunders on September 26, 2011 regarding his intent to act on his sense of danger, he "acted with swiftness and velocity." Dr. Saunders noted her opinion that Inmate B's behavior was "rooted in delusional thinking and based on distorted perceptions which lack basis in reality." She noted the risk of harm by Inmate B writing, "It is important to note that Inmate [B] has a history of assaultive behavior toward others based on his paranoid ideation and delusional belief system which consists of…special powers to sense danger and respond proactively…" Notably, Dr. Saunders makes note of Inmate B's violence potential for the first time writing, "Staff should be cautious in their interactions with him if he appears agitated and/or hostile. While the prediction of risk to perpetrate violent acts is a difficult venture, Inmate [B] is considered to be at high risk to commit future acts of violence given his psychosis and history."

Inmate B was seen by Dr. Cassandra Norcross, Staff Psychologist, on May 11, 2012 while housed in the SHU. No mental status deficits or concerns were noted by Dr. Norcross. Dr. Norcross also completed three SHU Reviews for Inmate B (May 9, 2012, June 6, 2012, and July 3, 2012). It is also noted in records that Inmate B contacted Dr. Saunders in writing on May 17. 2012 terminating treatment services due to his belief that she negatively influenced his thinking.

## B.  Review of Federal Bureau of Prisons Policies and Procedures for the Delivery of Psychological Services

Sound prison and mental health policy and procedures for the screening, evaluation and treatment of inmates are critical elements in protecting inmates against harmful effects associated with incarceration.

First and foremost is identifying and adequately monitoring inmates at high-risk for decompensation, self-injury, or injury to others. The FBOP is no exception, as psychology staff members are tasked with the responsibility of providing services and monitoring the care of inmates with mental illness.

## C.  Dr. Saunders' Compliance with Policy and Standards of Practice

Of primary concern with regard to the treatment Dr. Saunders provided Inmate B was her apparent failure to adequately assess his potential for violence. As Dr. Saunders noted in her last contact with Inmate B on May 7, 2012, "Staff should be cautious in their interactions with him if he appears agitated and/or hostile. While the prediction of risk to perpetrate violent acts is a difficult venture, Inmate [B] is considered to be at high risk to commit future acts of violence given his psychosis and history." This is particularly disconcerting given that Inmate B was agitated and hostile with a history of violence associated with psychosis, amongst other clinical and mental status deficits, observed in her last meeting with Inmate B prior to his assault on Inmate A. Given the indicators of violence noted on May 7, 2012 were present on January 17, 2012, it is disconcerting that there was no risk prevention plan for violence noted or communicated in treatment records. Specifically, it appears that Dr. Saunders did not even conduct an assessment of ideation, intent, or plan for violence, in spite of the violence indicators present, although she did such an evaluation for suicide.  This discrepancy, given the inmate's history of violence, including an assault that precipitated his transfer to USP-Big Sandy, is particularly disconcerting. This absence of an assessment of the inmates' risk for violence or communication of his potential for violence is not consistent with the FBOP policy or clinical standards of practice (e.g., IACFP Practice Standards Committee, 2010).

Dr. Saunders also did not provide services consistent with FBOP policy. Specifically, Inmate B refused to sign his treatment plan on February 6, 2012. According to policy PS5310.13 Mentally Ill Inmates, Institution Management of, Guideline 9. Treatment Compliance, states that inmates "deemed to need special attention as a result of a significant mental impairment…shall be interviewed at least monthly to assess his or her level of functioning and need for changes in treatment strategy" (p. 5). Dr. Saunders did not appear to practice in a manner consistent with FBOP policy regarding the treatment of inmates with mental illness. Specifically, Inmate B refused to sign his treatment plan on February 6, 2012, and Dr. Saunders documented that her treatment plan was to follow-up with Inmate B in "10-12 weeks." This appears to be in violation of the FBOP policy as Dr. Saunders failed to comply with the expectation that monthly interviews would be conducted to assess Inmate B's functioning. Clearly this is not consistent with policy, and it is my opinion that this deviation from policy and the lack of follow-up fell below the standard of care.

Contrary to policy, there is no indication that Dr. Saunders was compliant with Guideline 8 Assessment and Treatment Planning as she did not assess the inmates' "need for special housing" or Guideline 10 Special Housing and Management which states that "…it may occasionally be necessary to modify a mentally ill inmates' housing, work, or program assignment. This may include placement in a single cell…" For example, when Inmate B reported concern about being assigned a cellmate, there was no follow-up with security, classification, or housing documented in treatment records (see Program Statement: Psychology

11

Services Manual [Ch. 3, p. 3], "notify appropriate staff if they believe that a mentally ill…inmate will be affected by…housing changes…").  It appears that this concern went unattended in spite of the fact the inmate expressed concern about a cellmate, has a documented history of incorporating others into his delusional ideations, and explicitly expressed his intent to "do all in my power to protect and defend myself from extremist and infiltration. The first thoughts I hear of or (sic) threatening to me will be repelled with maximum force and velocity."

Although not explicitly mandated by policy, it is disconcerting to me that Dr. Saunders did not refer Inmate B for a psychiatric evaluation (absence of referral in Inmate B's treatment record). This is particularly noteworthy after her session with Inmate B on January 17, 2015. The inmate requested this session to complain about increased sleep disturbance, and review of Dr. Saunders treatment notes suggests a clear decompensation in functioning by Inmate B to include increased symptoms of psychosis. Such decompensation usually warrants a treatment referral to a psychiatrist for possible prescription of psychotropic mediation, yet this was not done. It is not clear to me why, what seems to me to be a routine clinical practice, was not implemented.

### D.  Dr. King's Supervisory Responsibility

As noted above, it is my opinion that Dr. Saunders assumed the duty of care for Inmate B on September 26, 2011 when she had her initial session (i.e., that session initiated her clinical responsibility for the inmate); however, per FBOP policy Dr. King maintained supervisory responsibility for the care of Inmate B. Specifically, Chapter 4.3(C)1 states "Each Chief Psychologist is responsible for assessing the treatment needs of the inmate population on an annual basis and for determining what methods of treatment (i.e., individual and/or group psychotherapy) will best meet these assessed needs." Furthermore, Dr. King stated in his declaration "with a high degree of certainty" that he consulted on a weekly basis with Dr. Saunders; thus, it is reasonable to expect that they consulted regarding Dr. Saunders treatment of Inmate B (this was in fact confirmed by Dr. Saunders in her deposition on June 25, 2015). Finally, Dr. King co-signed at least some of Dr. Saunders treatment notes (see Stacy Saunders deposition, p. 29). It is my opinion that if Dr. King consulted with Dr. Saunders or reviewed the treatment note she wrote after her session with Inmate B on January 17, 2012 and was aware of the subsequent two missed treatment sessions, as the Chief Psychologist responsible for inmate mental health care, he failed to meet the standard of care by not intervening with Dr. Saunders to facilitate further assessment of Inmate B's risk of violence.

## CONCLUDING OPINIONS

I was asked to examine the nature and quality of treatment provided Inmate B by Dr. Stacy M. Saunders, a staff psychologist with the FBOP. It is alleged by the plaintiff that Dr. Saunders failed to protect him from attack by Inmate B resulting in his personal injury, and his being subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution. It is my opinion that the duty of care for Inmate B was transferred to Dr. Saunders upon her initial contact with said inmate on September 26, 2011. Dr. Saunders saw Inmate B 7 times over an 8 month period, but did not meet with the inmate for over three months prior to his (Inmate B's) alleged assault on the plaintiff.

12

Based on my review of treatment records, Inmate B's presentation vacillated between cooperative and responsive to agitated, hostile, with oppositional attitudes and evidencing significant deficits in mental status functioning. It is my clinical opinion that this pattern of varied presentation was in a direction to suggest psychiatric decompensation culminating in his requesting an appointment with Dr. Saunders for which he was seen on January 17, 2015. During this session, Inmate B noted concern regarding the possibility of him being celled with another inmate to which he stated, "They must know that I will do all in my power to protect and defend myself from extremist and infiltration. The first thoughts I hear of or threatening to me will be repelled with maximum force and velocity." Of further concern, he evidenced delusional ideation (including paranoid ideation) whereby he incorporated USP-Big Sandy correctional officers into his delusional belief system. Finally, it was noted that during this session Inmate B evidenced significant mental status deficits. As a result of his impaired functioning, Dr. Saunders upgraded Inmate B's level of care to Mental Health Care Level Two. In spite of the inmates' decompensation and verbal threat to the well-being of other inmates, and hostile ideation toward correctional staff, it does not appear that Dr. Saunders conducted an assessment of the inmates' potential risk for violence (i.e., ideation, intent, or specific plan for violence), notified correctional staff beyond Inmate B remaining on "Psych Alert" status or took other precautions to limit the potential risk Inmate B presented to others (i.e., there is no documentation in the treatment note of any such precaution). Such practice is in violation of FBOP policy and falls below the standard of care (e.g., IACFP Practice Standards Committee, 2010).

Given my investigation to date in this case, I offer the following opinions:

1. Dr. Saunders assumed duty of care for Inmate B during her clinical contact with him on September 26, 2011.

2. Although Inmate B evidenced decompensated mental health functioning to include increased symptoms of psychosis and verbalized plans of violence, over the course of treatment, specifically between September 26, 2011 and January 17, 2012, it does not appear that Dr. Saunders notified correctional staff beyond Inmate B continuing to remain on "Psych Alert" status or took precautions to limit the potential risk Inmate B presented to others (i.e., there is no documentation in the treatment note of any such precaution). Therefore, it is my opinion that given the level of risk communicated by Inmate B and the decompensated mental health functioning compared to his presentation in prior sessions, Dr. Saunders' practice fell below the standard of care to protect the welfare of Inmate B or those with whom he had contact.

3. Dr. Sanders did not conduct an adequate assessment of Inmate B's potential for violence to others, in spite of indicators of risk of violence. Furthermore, when Inmate B did not attend follow-up sessions after evidencing decompensated mental health care and verbalized threats of violence, Dr. Saunders took no precautions to further assess or minimize that risk. Thus, it is my opinion that the absence of a formal assessment of the inmates' risk for violence, implementation of risk prevention plan, or communication of his potential for violence is not consistent with the FBOP policy or clinical standards of practice (e.g., IACFP Practice Standards Committee, 2010).

4. Dr. Saunders failed to provide psychological services in a manner consistent with FBOP policy and procedures, as well as consistent with professional standards (IACFP Practice Standards Committee, 2010). Thus, it is my opinion that this deviation from policy and the lack of treatment follow-up with Inmate B fell below the standard of care.

5. Per FBOP policy, Dr. King maintained supervisory responsibility for the care of Inmate B, and it is my opinion that if Dr. King consulted with Dr. Saunders or reviewed the treatment note she wrote after her session with Inmate B on January 17, 2012 and was aware of the subsequent two missed treatment sessions, as the Chief Psychologist responsible for inmate mental health care, he failed to meet his standard of care by not intervening with Dr. Saunders to facilitate further assessment of Inmate B's risk of violence.

6. It is my opinion that Dr. Saunders practice failed to meet the standard of care, which resulted in a causal nexus (i.e., an established link between the most probable cause and its resulting effects) for Inmate B's alleged assault on the plaintiff.

I understand that discovery is not yet complete in this case. I reserve the right to amend, revise and or supplement this report should I receive additional information which I believe is material to my opinions.

Dated: August 19, 2015                                    Respectfully Submitted,

_____
Robert D. Morgan, Ph.D.
Licensed Psychologist (Texas, 31546)