UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

| | |
|---|---|
| CHRISTOPHER HOLDER,<br><br>    Plaintiff,<br><br>V.<br><br>STACY M. SAUNDERS, et al,<br><br>    Defendants. | CIVIL ACTION NO. 7:13-38-KKC<br><br>OPINION AND ORDER |

*** *** ***

Plaintiff Christopher Holder brings a *Bivens* claim against Dr. Terry King and Dr. Stacy Saunders, both of whom were formerly employed as psychologists at United States Penitentiary—Big Sandy. Specifically, the Complaint alleges that Dr. King and Dr. Saunders violated Holder's Eighth Amendment rights by failing to protect him from a fellow inmate. Though the matter was initially slated for trial, the parties agreed to submit it for adjudication on the briefs. [DE 148.] The Court has reviewed the parties' submissions [DE 155; DE 158; DE 159] and renders these final findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). For reasons discussed below, the Court enters judgment in favor of defendants Dr. King and Dr. Saunders.

## FINDINGS OF FACT

Inmate, A.T. assaulted and stabbed his fellow inmate Christopher Holder on May 7, 2012, while they were incarcerated at USP Big Sandy. As a result of the attack, Holder suffered a broken ankle and multiple lacerations all of which were treated at the facility.

The attack occurred after A.T., a bi-racial male who self-identifies as a black male, accused another black male, Holder, of conspiring with the "Brotherhood" to assassinate him. [DE1, 1-3.] After making the accusation, A.T. retreated to an upstairs residential area, but was followed by

Holder, who claims that he was seeking to "peacefully resolve" the rift. [DE 155 at 9.] The defense maintains that Holder continued to argue with A.T. and followed him upstairs to confront him. [DE 15, 32-33.] There is no dispute, however, that once they were both upstairs, A.T. reached in his pocket, produced a shiv and lunged toward Holder, stabbing him multiple times before the parties hit the ground and were separated. [DE 9-6, at 52.]

BOP records show that A.T. had violently attacked an inmate at another institution. This attack led to A.T.'s designation as a "psych alert" inmate because the attack arose from his "delusional belie[f] system relative to racial issues." [DE 27-1, at 1.] Because of his psychological designation, A.T. was required to meet personally with a psychologist for screening upon arriving at USP Big Sandy. [DE 89-5, at 23.] This screening was performed by defendant Dr. King, who was chief psychologist.

Dr. King reviewed A.T.'s records before meeting him. These records included entries from the Psychological Data System ("PDS") and the BOP's SENTRY database. [DE 89-5, at 27.] BOP records revealed that A.T. had a history of mental illness, but previous treating psychologists had expressed uncertainty regarding the nature and severity of A.T.'s mental health problems. In 2008, A.T. participated in an inpatient mental health study at a federal medical institution. Though the full study was not made available to Dr. King, a July 2009 PDS entry contained the study's conclusion that A.T. had both an Axis I diagnosis related to substance abuse issues and an Axis II antisocial personality order. [DE 89-2, at 6.] A later PDS entry from FDC Philadelphia stated that A.T. did not "have a formal mental health diagnosis per se" and that his psych alert status was instead "maintained as a valid management tool because of his history of engaging in serious violence possibly as the result of beliefs and perceptions regarding social dynamics that may not be fact based." [DE 89-2, at 6.] A.T. was also examined at the Oklahoma Transfer Center in July 2011. The psychologists there did not observe any signs of a mental illness.

Based on a review of A.T.'s BOP records and the September 8, 2011 personal interview, Dr. King determined that A.T. was not experiencing "significant mental health problems." Dr. King then referred A.T. for further evaluation and treatment. Though A.T. was released to the general population, his psych alert status remained intact. [DE 89-5, at 33.]

As a follow up, A.T. was scheduled on September 20, 2011 to meet with defendant Dr. Saunders, a former staff psychologist, but A.T. did not show up for the appointment.[1] Dr. Saunders met A.T. for the first time about a week later on September 26, 2011, when he told her that he did not "trust white psychs" because of past negative experiences with them. [DE 27-1, 1-3.] In the meeting, A.T. expressed special disdain for the psychologists at a previous institution who had placed him in the Segregated Housing Unit ("SHU"). [DE 27-1, at 3.] A.T. further indicated to Dr. Saunders that beginning in his early thirties, he began to realize that he had "special abilities," including the power to sense the thoughts of others.

Dr. Saunders discussed with A.T. the possibility that his perceptions and beliefs might be symptomatic of a mental health condition. While A.T. was somewhat receptive to the theory, he voiced opposition to taking antipsychotic medications. In her documents, Dr. Saunders observed that A.T.'s impulses were "within normal limits" and that his "[m]ental status [was] remarkable for delusional processes and auditory hallucinations." Dr. Saunders opted to keep A.T.'s psych alert designation in place based on the belief that he had "untreated symptoms and could evidence behavioral disturbance based on delusional/hallucinatory content." She scheduled an appointment to follow up with A.T. two weeks later. [DE 27-1, at 4.]

At the time of A.T.'s first meeting with Dr. Saunders, he was designated by the BOP as a Care Level One-Mental Health inmate. Per BOP's Program Statement 5310.13, Treatment and Care of Inmates with Mental Illness, an individual is considered to meet Care Level One if he: (1) shows

---

[1] This is not uncommon as an inmate can refuse psychological treatment unless a Court specifically orders otherwise.

3

no significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health interventions; and (2) has no history of serious functional impairment due to mental illness or if a history of mental illness is present, the inmate has consistently demonstrated appropriate help-seeking behavior in response to any re-emergence of symptoms. Care Level One inmates are not required to receive any regular mental health services. Nor do they require a treatment plan.

A.T. missed his October 11, 2011 follow-up appointment with Dr. Saunders, who rescheduled the appointment and saw him two days later. [DE 27-1, at 6.] During the session, Dr. Saunders asked A.T. how he had been feeling/functioning since his last appointment. A.T. refused to answer the question and told Dr. Saunders that "they" had advised him not to speak with her. Dr. Saunders gathered that, by "they," A.T. meant legal counsel, but it was not clear when he was given this advice. Dr. Saunders suggested to A.T. that voices in his head may be "impairing his perception of reality." Dr. Saunders's notes reveal that she was under the impression that A.T.'s impulse control was within normal limits, but that his "[m]ental status [was] remarkable for delusional processes and auditory hallucinations." Dr. Saunders kept A.T.'s psych alert status intact and scheduled another follow-up appointment.

On November 15, 2011, A.T. missed another appointment with Dr. Saunders, but saw her a week later, on November 21, 2011. [DE 27-1, 8-9.] Dr. Saunders's notes describe A.T.'s behavior as agitated and hostile. During the meeting, Dr. Saunders informed A.T. that he was under no obligation to stay and speak with her. In response, A.T. told Dr. Saunders that no longer wanted to see a psychologist but promised he would reach out via a "cop-out" form if he needed her help. Dr. Saunders documented her impression that A.T.'s cognitive processes were logical and goal oriented, and his impulse control was within the normal limits. She scheduled a follow up appointment in 90 days. [DE 27-1, at 9.]

On December 23, 2011, there was a lockdown at USP Big Sandy. Pursuant to prison policy, Dr. Saunders went and met with all psych alert inmates, including A.T. [DE 89-5, at 112.] A.T. reported to Dr. Saunders that he was doing well overall, though he was having some trouble sleeping. Dr. Saunders advised A.T. that she would discuss these issues with him following the completion of the lockdown. In her treatment notes, Dr. Saunders stated that A.T.'s cognitive processes were logical and coherent and that his impulse control appeared to be within normal limits. [DE 27-1, at 10.]

Dr. Saunders visited A.T. in his cell four days later as a result of another lockdown. A.T. indicated to Dr. Saunders that he was doing well and denied having any issues requiring clinical intervention. [DE 27-1, at 11.] Dr. Saunders observed no "indications of a thought disorder, psychosis, or disturbance of perception." [DE 27-1, at 11.] She further opined that this attention, concentration, and impulse control were within normal limits. [DE 27-1, at 11.]

At A.T.'s request, Dr. Saunders saw him again about two weeks later, on January 17, 2012. A.T. had reported on his cop-out form that he was having trouble sleeping and was extremely irritated by the prison staff's efforts to "double-cell" him. [DE 27-1, at 12.] He also warned that he would use his full powers to "protect and defend" himself and that any perceived threats would be "repelled with maximum force and velocity." [DE 27-1, at 12.]

A.T. discussed the plight of his ancestors and his special cognitive abilities during his session with Dr. Saunders. Also, he produced an old photograph depicting a lynching and compared the individuals holding up the victim's body to the staff members at USP Big Sandy. Dr. Saunders explained to A.T. that the photograph was very old and that none of the members of the prison staff were alive when the depicted events took place. A.T. was apparently confused by Dr. Saunders's response. Nevertheless, he quit talking about the photograph and put it away. The session continued until A.T. stated that he was "done" and abruptly exited Dr. Saunders's office. [DE 27-1, at 12.] In her notes, Dr. Saunders described A.T. as being "hostile and animated" and obsessed with "racial

5

and persecutory themes." [DE 27-1, at 12.] She also documented that A.T.'s level of insight and impulse control appeared to be "limited." [DE 27-1, at 12.] She scheduled A.T. for a follow up in 4-6 weeks and kept his psych alert designation in place. [DE 27-1, at 12.]

On February 6, 2012, Dr. Saunders reclassified A.T. to a Care Level Two-Mental Health inmate based on "his presentation of psychotic symptoms consistent with a diagnosis of Schizophrenia." [DE 27-1, at 13.] She revised A.T.'s diagnoses to include Axis I Schizophrenia and expressed her desire to see him on a monthly basis given his "presentation and history of violence." [DE 27-1, at 13.]

Because Dr. Saunders had elevated A.T. to Care Level Two, she created a treatment plan as required by the BOP. [DE 89-8, at 86.] In the plan, Dr. Saunders indicated that A.T. was experiencing symptoms including paranoid delusions, auditory hallucinations, disorganized speech, and affective flattening. [DE 27-1, at 15.] Dr. Saunders set a series of targets aimed at managing A.T.'s symptoms and helping him maintain an adequate level of function. As for intervention, the plan required Dr. Saunders to meet with A.T. at least once every twelve weeks. [DE 27-1, at 16.]

When Dr. Saunders presented A.T. with the treatment plan, he refused to sign it. [DE 27-1, at 18.] In response, Dr. Saunders scheduled A.T. for a follow-up appointment on February 21, 2012. A.T. skipped this appointment and Dr. Saunders rescheduled for March 1, 2012. Again, A.T. was a no show. [DE 27-1, at 20.] Dr. Saunders's notes from March 1, 2012 indicated that she would schedule a follow-up in ten to twelve weeks, but that A.T. could request an earlier appointment. [DE 27-1, at 20.]

Dr. Saunders did not see A.T. again until May 7, 2012, the day he attacked Plaintiff Holder. Following the altercation, Dr. Saunders was called into the SHU to speak with A.T. [DE 27-1, at 21.] A.T. admitted to attacking Holder but could not recall his name. A.T. proclaimed that Holder was a legitimate threat and that his "powers of protection" had saved him once again. Dr. Saunders's notes reflect her opinion that A.T.'s violent outburst was "rooted in delusional thinking and based on

6

distorted perceptions which lack basis in reality." Her PDS entry also referenced A.T.'s history of assaultive behavior, his belief in his special powers to sense danger and respond proactively, and his distrust of individuals who were white. [DE 27-1, at 21.]

The next day Dr. Saunders submitted an official incident report. [DE 27-1, at 24.] Dr. Saunders warned staff to be cautious in their interactions with A.T. given his "history of incident reports for weapon possession while on the compound." [DE 27-1, at 25.] The report also stated that "[w]hile the prediction of risk to perpetrate violent acts with certainty is a difficult venture, [A.T.] is considered to be at a high risk to commit future acts of violence given his psychosis and history." [DE 27-1, at 25.] The report ended by noting that the psychology department would be recommending that A.T. be transferred "to a more appropriate facility." [DE 27-1, at 25.]

On May 9, 2012, staff psychologist Dr. Cassandra Norcross went to visit A.T. in the SHU and conducted a psychological review. [DE 27-1, at 26.] Dr. Norcross concluded that A.T. had "significant" mental health issues and that his adjustment to SHU was unsatisfactory. She labeled A.T.'s threat to self as "low" and his threat to others as "moderate." After another visit two days later, Dr. Norcross described A.T. as "actively delusional" and reported his refusal to acknowledge the presence of a mental illness. [DE 27-1, at 27.] She also branded his insight and judgment as "limited." [DE 27-1, at 27.]

On May 17, 2012, A.T. wrote a letter to Dr. Saunders. [DE 27-1, at 28.] In the letter, A.T. accused his cellmate of stealing his "most prized property" and complained that the SHU property officer did not allow him to report the stolen items. [DE 27-1, at 28.] A.T. further claimed that if it were not for Dr. Saunders putting the wrong ideas in his head, he would have "cut [the cellmate's] throat on 5 occasion[s]." [DE 27-1, at 28.] A.T. finished the note by stating that he was "ceasing dealing with [Saunders]."

Dr. Norcross conducted additional psychological reviews of A.T. on June 6 and July 3, 2012. On June 6, Dr. Norcross observed that A.T.'s mental status and behavior did not "suggest significant

7

mental health problems." [DE 27-1, at 30.] She labeled his adjustment to SHU as "satisfactory" and his threat to himself and others as "low." She then opined that A.T. did not have any "acute mental health problems requiring immediate psychological intervention." [DE 27-1, at 30.] On July 3, Dr. Norcross indicated that A.T.'s mental health status and behavior did not suggest significant mental health problems. That said, she labeled A.T.'s threat to others as "high." A.T. was later transferred to a federal medical center for a mental evaluation. The treating psychologists concluded that A.T. was *not* suffering from an Axis I mental illness. Moreover, they refused to recommend him for involuntary commitment. [DE 89-8, at 86-87.]

## **PROCEDURAL HISTORY**

On May 2, 2013, Holder filed this pro se action. The original complaint alleged that defendants Dr. Stacy Saunders, Dr. Terry King, and warden Robert Farley violated Holder's Eighth Amendment rights by failing to protect him from A.T. [DE 1.] The matter was assigned to then-District Judge Amul Thapar. On February 12, 2014, all three defendants filed a motion to dismiss or in the alternative, a motion for summary judgment. [DE 25-1.] Judge Thapar dismissed the claims against defendant Farley after finding that he was not the warden of the USP Big Sandy at the time of the attack. Judge Thapar ordered the clerk to perfect service on David Berkebile, who was apparently the warden at the time of the event giving rise to the litigation. Judge Thapar also dismissed defendant Dr. King from the action after finding there was no evidence suggesting that Dr. King had *personally* violated Holder's rights. [DE 33, at 3.]

In the same opinion, Judge Thapar determined that Holder had proffered sufficient evidence for a reasonable jury to find that Dr. Saunders committed a constitutional violation. Dr. Saunders filed a motion for reconsideration, insisting that Judge Thapar had mistakenly classified Holder as a white inmate who was at risk of A.T.'s racial animus. [DE 40.] Dr. Saunders clarified that Holder was biracial, self-identified as a black male, and was listed in BOP databases as a black male. She further argued that the doctrine of qualified immunity insulated her from Holder's lawsuit.

While Judge Thapar acknowledged that Holder was a black male, he found that a reasonable jury could still find that Dr. Saunders was deliberately indifferent to the substantial risk of harm presented by A.T. Judge Thapar also rejected Dr. Saunders's assertion of qualified immunity.

In November 2014, the parties notified Judge Thapar that Michael Smith, not David Berkebile, was the warden of USP Big Sandy on the date of the attack. [DE 46.] Accordingly, the Court removed Berkebile from the action and ordered service on Smith. Judge Thapar eventually dismissed the claims against Warden Smith after finding that A.T. had not administratively exhausted his claims against the warden. [DE 60.]

On February 1, 2015, Judge Thapar assigned a lawyer to represent Holder. [DE 53.] Holder then moved to set aside the Court's previous dismissal of the claims brought against Dr. King claiming that evidence had surfaced during discovery showing that Dr. King was required by BOP policy to review and co-sign reports written by any new staff psychologist. Because Dr. Saunders had only been at USP Big Sandy for two months before she began treating A.T., Holder suggested that Dr. King was required to (and may have actually) signed off on Dr. Saunders's reports and notes concerning A.T. [DE 68, 2-5.] Upon review, Judge Thapar granted Holder's motion on grounds that a reasonable jury could find that "King knew A.T. was dangerous" yet "knowingly acquiesced to Dr. Saunders's treatment plan." [DE 83, at 4-5.]

Defendants Dr. King and Dr. Saunders later moved for summary judgment on the grounds that: (1) they were covered by qualified immunity; (2) there was no evidence to suggest deliberate indifference on the parts of Dr. King and Dr. Saunders; and (3) Holder's injuries were not proximately caused by the defendants, but rather his own decision to walk upstairs and confront A.T. [DE 89-1.] Judge Thapar denied the defendants' motion, rejecting each of the three tendered arguments. [DE 102.] The matter was then slated for trial. [DE 104.]

Dr. Saunders and Dr. King appealed the Court's summary judgment. [DE 118.] *Holder v. Saunders*, No. 15-6305, 2017 WL 3401288, at *6 (6th Cir. Apr. 28, 2017). The appeals court affirmed

9

Judge Thapar's finding that a reasonable jury could find that Holder was being held in a situation objectively dangerous and that Dr. Saunders and Dr. King knowingly disregarded that risk. The panel also rejected defendants' qualified immunity and proximate cause arguments.

This matter was transferred to the undersigned following Judge Thapar's appointment to the United States Court of Appeals for the Sixth Circuit. [DE 133.] On August 17, 2017, defendants Dr. King and Dr. Saunders moved for judgement on the pleadings arguing that the Supreme Court's *Ziglar* decision warranted the dismissal of Holder's claims against them. [DE 137.] The Court denied the motion on the basis that Holder's claims against the defendants did not qualify as a new *Bivens* context. [DE 144, at 3.] The Court also found, in the alternative, that Holder's action did not involve any of the special factors contemplated by *Ziglar* that would counsel hesitation. [DE 144, at 5.]

Though a trial date was set, the parties advised the Court during a series of teleconferences that they were agreeable to submitting the matter on the briefs. [DE 147; DE 148.] As such, the Court set aside the trial date and set a briefing schedule. [DE 154.] The parties have since submitted their trial briefs and the case is ripe for decision.

## CONCLUSIONS OF LAW

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that the Constitution implies a damages remedy against federal officers for the violation of an individual's Fourth Amendment rights. *See id.* at 390–97. In the decade following the *Bivens* decision, the Supreme Court expanded the implied damages remedy to cover two additional contexts: claims asserting sex discrimination under the Fifth Amendment's Due Process Clause, *Davis v. Passman*, 442 U.S. 228, 244 (1979), and claims arising from the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Carlson v. Green*, 446 U.S. 14 (1980).

Plaintiff Holder brings this action under *Carlson*, alleging that defendants Dr. King and Dr. Saunders violated his Eighth Amendment rights by failing to protect him from A.T. [DE 1.] For the Court to rule in Holder's favor, it must make two findings: (1) that Holder was imprisoned under conditions posing an objectively substantial risk of serious harm; and (2) that defendants Dr. King and Dr. Saunders subjectively ignored this risk to Holder's safety. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

## I.

The first prong of the failure-to-protect analysis is often referred to as the "objective component." It looks to the seriousness of the deprivation and requires the presiding court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

In evaluating the objective component, Sixth Circuit caselaw is not entirely clear as to whether the district court should focus on the severity of the ultimate injury or the risk posed before it occurred. [DE 51, at 9.] In at least one instance, the Sixth Circuit has focused solely on whether the inmate bringing the failure-to-protect claim suffered a sufficiently severe injury. *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) ("We agree with the district court that the harm alleged by all plaintiffs, being beaten without cause by a prison guard, is sufficiently serious to fulfill the objective component of this definition."). In other cases, however, the Sixth Circuit has peered beyond the injury suffered by the plaintiff and examined whether there was an objectively substantial risk of harm before the injury occurred. *See, e.g.*, *Bishop* 636 F.3d at 766 (6th Cir. 2011).

Here, Holder claims that the defendants failed to protect him from a dangerous inmate. Thus, consistent with the United States Supreme Court's directives in *Farmer*, this Court will focus on whether an objectively substantial risk of harm existed before the attack on Holder.

11

Holder asserts that the unreasonable risk A.T. posed to other inmates was obvious to prison officials. [DE 155, at 1] (describing A.T. as a "ticking time-bomb"). Holder notes that before being transferred to Big Sandy, A.T. had spent several years in SHU for violently assaulting another inmate. Holder further underscores A.T.'s long history of mental health issues, his belief that he possesses special abilities, and the bizarre statements made to Dr. Saunders about preemptively striking out against supposed threats. Additionally, Holder argues that A.T. should have been transferred when Dr. Saunders elevated his psychiatric care classification because Big Sandy, a Care Level One institution, was no longer equipped to handle him. Finally, Holder urges the Court to consider indications in the record that in the months preceding the attack, A.T.'s mental condition was rapidly deteriorating while he was refusing psychological treatment. [DE 155, at 15.]

Defendants insist that Holder was not exposed to an unreasonable risk of harm, but only the typical dangers associated with being an inmate at a high-security federal penitentiary. Defendants direct the Court's attention to A.T.'s original intake screening, which included a review of A.T.'s BOP records and a personal interview. The defendants also underline Dr. Saunders's belief that A.T. did not pose a danger to himself or others before the May 7, 2012 incident. This opinion is reflected in the treatment notes from several meetings. Moreover, A.T. had been housed at Big Sandy for almost nine months without any indications of violent behavior. [DE 158, at 3.] Holder, the eventual victim, even testified that he was not afraid of A.T. and that his actions came as a complete surprise. [DE 89-6, at 43.]

High-security federal prisons are dangerous by nature. *See Dahne v. Richey*, 139 S. Ct. 1531, 1532 (2019) ("Prisons are dangerous places."). And, these institutions house some of the nation's most volatile individuals, many of whom have mental health problems.[2] With these realities in mind,

---

[2] A 2006 report by the federal Bureau of Justice Statistics estimates that 44% of the male federal prison population suffers from some form of mental illness. James & Glaze, *Mental Health Problems of Prison and Jail Inmates*, BJS (Sept. 6, 2006), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=789.

the Court must determine whether A.T.'s unrestricted access to the inmates of Unit C-4 posed an objectively substantial risk to them.

There is no dispute that A.T. has a history of mental health problems. The severity of A.T.'s problems, however, was a point of contention among the psychologists who treated him prior to his arrival at USP Big Sandy. Specifically, there was uncertainty as to whether A.T. suffered from an Axis I mental illness or an Axis II personality disorder. Upon A.T.'s arrival at Big Sandy, Dr. King referred him for further evaluation and kept his psych alert status in place. According to Dr. King, this was so the psychology department could better diagnose A.T.'s mental condition. [DE 89-5, at 32.]

In the fall of 2011, Dr. Saunders met with A.T. four times. Though A.T. repeatedly referenced his special capabilities during these meetings and was resistant to psychological treatment, his impulse control, according to Dr. Saunders, appeared to be completely normal. Moreover, in December of 2011, Dr. Saunders visited A.T. twice in his cell during lockdowns. A.T. reported to Dr. Saunders that he was having trouble sleeping but was otherwise doing well. Dr. Saunders walked away from these meetings believing that A.T.'s impulse control was within the normal limits. Following the lockdowns, A.T. requested to see Dr. Saunders via a "cop-out' form. A.T. indicated in the form that he was having "extreme difficulties sleeping" and noted his frustration that the prison staff was trying to assign him a cellmate. A.T. further warned that he would do everything in his power to defend himself and that any threatening voices he heard would "be repelled with maximum force and velocity." [DE 27-1, at 12.]

Per A.T.'s cop-out request, Dr. Saunders met with him on January 17, 2012. Dr. Saunders's notes reveal that A.T. was "markedly agitated" during the session and "highly focused on racial and persecutory themes." A.T. also brought in a photograph depicting a lynching and compared the prison staff to the white men in the photograph who had perpetrated the awful act. When Dr. Saunders explained to A.T. that none of current staff members were alive when the depicted events

13

occurred, A.T. appeared confused. After some further discussion, A.T. stated that he was finished with the session and abruptly left Dr. Saunders's office. Dr. Saunders documented that A.T.'s impulse control was "limited" and scheduled a follow-up appointment for 4-6 weeks. [DE 27-1, at 12.]

On February 6, 2012, Dr. Saunders upgraded A.T. to a Care Level Two-Mental Health inmate on the basis that he was exhibiting symptoms "consistent with a diagnosis of Schizophrenia." [DE 27-1, at 13.] BOP policy required Dr. Saunders to develop a treatment plan for A.T. following the elevation of his Care Level. When presented with the treatment plan, A.T. refused to sign it—as was his right. In response to A.T.'s actions, Dr. Saunders kept him on psych alert and scheduled him for follow-up appointments. A.T., however, missed appointments scheduled for February 21 and March 1, 2012. Dr. Saunders would not see A.T. again until after he attacked Holder.

Dr. Saunders testified that at no point before the May 7, 2012 attack, did she believe that A.T. presented a level of risk that would mandate his removal from general population. She specifically noted that the psychology services department did not receive a single complaint regarding A.T.'s behavior during the time leading up to the attack. Rather, he appeared to be interacting normally with fellow inmates. [De 89-8, at 56.] Dr. Saunders also pointed out that A.T. never made any specific threats against an individual or group of individuals—though it appeared that he was harboring some significant racial animus. Dr. King, who consulted with Dr. Saunders's regarding A.T., also testified that he did not believe that A.T. posed a substantial risk to other inmates. Like Dr. Saunders, Dr. King noted that A.T. had not made any threats to specific individuals and did not display any behavior that concerned the prison guards. [DE 89-5, at 123-137.]

After carefully considering the matter, the Court concludes that Holder was not imprisoned under conditions posing a risk that violates "contemporary standards of decency." *Villegas*, 709 F.3d at 568. As such, Holder has failed to satisfy the objective component of his failure-to-protect claim.

14

A.T. has a significant mental health history and his belief in his own superhuman abilities would raise concerns in any normal setting. The problem for Holder is that USP Big Sandy is not a normal setting—it is a high security federal penitentiary. Many of the inmates housed at USP Big Sandy are volatile and aggressive. And studies show that a significant percentage of these individuals suffer from some degree of mental illness. It follows that BOP psychologists cannot segregate every impulsive and mentally suspect inmate from the general population—too many fit the description. Rather, the job of the psychologists is to flag the inmates who clearly pose an unacceptable risk to an already violent population. The record reveals that A.T. did not pose such a risk.

As a psych alert inmate, the prison staff watched A.T. more closely than other inmates. Despite this additional scrutiny, there was not a single report that A.T. was behaving in a strange manner. Rather, it appears that A.T. was interacting just fine with the other inmates, including Holder, prior to the attack. Additionally, though A.T. spoke of the potential to lash out against perceived threats, he did not identify any specific targets. This general potential for violence would not have materially distinguished A.T. from a typical USP Big Sandy inmate.

In total, the Court concludes that A.T.'s access to the other inmates of the unit did not create an objectively substantial risk of serious harm. Thus, Holder has failed to satisfy the objective component of his claim.

## II.

Even if Holder could establish that he was imprisoned under conditions posing an objectively substantial risk of serious harm—which he has not—he also fails to demonstrate that defendants Dr. King and Dr. Saunders consciously ignored the threats to his safety. Under this second or "subjective" component, the Court examines the state of mind of each defendant to determine whether they acted with "deliberate indifference" equivalent to an intent to punish. *See Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012).

Holder maintains that defendants Dr. Saunders and Dr. King knew of, but disregarded, the risk that A.T. posed to Unit C-4's inmates. He maintains that despite being aware that A.T. "was psychotic, paranoid, explosive, and had threatened to strike out against others 'with maximum force and velocity,' [Dr. Saunders] did not see or treat [A.T.], or take any other action to separate him" from the other inmates in the unit for almost four months. Instead, according to Holder, Dr. Saunders and the other psychologists let A.T.'s condition deteriorate, which primed him for an eventual outburst. And because Dr. King consulted with Dr. Saunders and may have reviewed some of her reports concerning A.T., Holder argues that he too is liable for her malfeasance.

Holder buttresses these arguments with the expert report of Dr. Robert D. Morgan. Dr. Morgan opines that "given the level or risk communicated by [A.T] and the decompensated mental health functioning compared to his presentation in prior sessions, Dr. Saunders practice fell well below the standard of care to protect the welfare of [A.T.] or those with whom he had contact." [DE 85-1, at 7.] Dr. Morgan's report also claims that "Saunders did not conduct an adequate assessment of [A.T.'s] potential for violence to others, in spite of indicators of risk of violence." [DE 85-1, at 7.] And, according to Dr. Morgan, Dr. Saunders did not take appropriate precautions when A.T. skipped follow-up sessions after "evidencing decompensated mental health functioning and verbalized threats of violence." In Dr. Morgan's view, these failures amounted to violations of BOP policy and the clinical standards set forth by the International Association of Correctional and Forensic Psychologists ("IACFP"). [DE 85-1, at 7.]

Dr. Morgan further concluded that that Dr. King, as the chief psychologist of USP Big Sandy, failed to satisfy his duty of care "by not intervening with Dr. Saunders to facilitate further assessment of [A.T.'s] risk of violence."

Defendants, to the contrary, insist that neither Dr. Saunders nor Dr. King had subjective knowledge of the risk that A.T. posed to the other inmates. [DE 158, at 21.] Dr. Saunders testified that she did not believe that A.T.'s symptoms warranted segregation because he "was in control of

himself" and did not make any specific threats. [DE 158, at 22.] Additionally, she testified that although A.T. was on the psych list circulated to correctional staff, there were *zero* complaints regarding his behavior in general population. [DE 158, at 22.] Defendants stress that even Holder, the victim of the attack, did not find A.T. to be unusual and was not afraid of him. [DE 158, at 24.]

Defendants make similar arguments with respect to Dr. King. Defendants emphasize that Dr. King cleared A.T. for general population after reviewing his BOP records and conducting an in-person interview. This decision was based on Dr. King's determination that there were no recent indications of significant mental health problems. Dr. King kept A.T. on the psych alert list and referred him to Dr. Saunders for further evaluation. Consistent with his supervisory role, Dr. King frequently met with Dr. Saunders and other psychologists to discuss inmate cases. Dr. King remembers that on at least one occasion, he and the other psychologists discussed A.T.'s symptoms and debated whether they signaled an Axis I mental illness or an Axis II antisocial personality disorder. [DE 158, at 26.] Dr. King further testified that he did not have any reservations regarding Dr. Saunders's treatment of A.T. and did not see anything in A.T.'s PDS records that would have triggered a duty to warn. [DE 89-5, at 80.]

Defendants also submit the expert testimony of Dr. Robert L. Denney. Dr. Denney's report stresses that psychologists at multiple BOP institutions struggled with diagnosing A.T.'s mental health problems. [DE 89-2.] A.T. participated in an inpatient mental health study at a federal medical center in April 2008. Though the entire study was not available for Dr. King's review, a PDS entry noted the study's conclusion that A.T.'s Axis I diagnoses were related to substance abuse issues and his primary diagnosis was an Axis II antisocial personality disorder. [DE 89-2, at 20.] A PDS entry from FDC Philadelphia in 2008 echoed this sentiment. The author indicated that while A.T. did not "have a formal mental health diagnosis per se," his psych alert status was "maintained as a valid management tool because of his history of engaging in serious violence possibly as the result of beliefs and perceptions regarding social dynamics that may not be fact based." [DE 89-2, at 6.]

17

A.T. was also seen by psychologists on his way to USP Atlanta. Though he was irritable, the PDS note indicated that there was no suggestion of mental illness. When A.T. arrived at USP Big Sandy, he was screened by Dr. King. After reviewing A.T.'s BOP records and conducting an in-person interview, Dr. King determined that A.T., in recent times, had not displayed any signs of a mental illness. He then released A.T. to the general population.

According to Dr. Denney, Dr. Saunders, like the psychologists who previously treated A.T., struggled to understand the nature of his problems. [DE 89-2, at 21.] And though Dr. Saunders would eventually elevate A.T. to Care Level Two based on symptoms of Schizophrenia, Dr. Denney believes that she still did not believe that A.T. was a danger to the general population. Dr. Denney's report also defends Dr. Saunders's actions following A.T.'s refusal to sign the treatment plan. Dr. Denney opines that BOP policy at the time only required Dr. Saunders to meet with A.T., then a Care Level Two inmate, once every twelve weeks. Thus, her efforts to schedule A.T. sooner went above and beyond protocol.

Dr. Denney's report also addresses the behavior of Dr. King. Dr. Denney asserts that Dr. King's supervision of Dr. Saunders was adequate and there was no way that he should have known that A.T. posed a specific threat. [DE 89-2, at 24.] Dr. Denney also chides Holder's expert, Dr. Morgan, for her reliance on standards set forth by the IACFP. Dr. Denney claims that the standards are "aspirational" and are by no means authoritative for psychologists treating inmates within the confines of BOP institutions. [DE 89-2, at 23.]

Based on the record and testimony before it, the Court finds that Holder has failed to show that Dr. King or Dr. Saunders consciously disregarded the risk posed by A.T. *See Sexton v. Neil*, No. 1:14CV26, 2014 WL 6453771, at *6 (S.D. Ohio Nov. 17, 2014). Though Holder casts A.T. as a paranoid Schizophrenic and a "ticking time-bomb," the state of A.T.'s mental health in early 2012 is a more complicated puzzle. Dr. Saunders, like those who preceded and followed her, struggled to diagnose A.T.'s condition.

Dr. Saunders upgraded A.T.'s Care Level after it appeared that his symptoms were worsening. She did not, however, subjectively believe that he was a substantial risk to the general prison population. Her deposition says as much. Importantly, Dr. Saunders attested that her belief was based, in part, on the fact that A.T. did not (1) make threats against a specific target, or (2) display any peculiar behavior while interacting with the other general population inmates.

Because Dr. Saunders had upgraded A.T. to a Care Level Two patient, she was required to meet with him once every 12 weeks. Nonetheless, she scheduled follow-up appointments for February 21 and March 1, 2012. A.T. failed to appear for these appointments. Though Dr. Saunders wanted to meet with A.T., she did not have the ability to force him to pursue psychological treatment. Moreover, in her professional opinion, she thought that harassing him might make matters worse—especially given A.T.'s general distrust of psychologists. Dr. Saunders would not see A.T. again until after he attacked Holder.

Following the attack, both Dr. Saunders and Dr. Norcross visited A.T. in the SHU. Their initial reports indicate that A.T. was suffering from psychosis and was actively delusional. Dr. Norcross's later reports, however, indicate that A.T. was no longer exhibiting behavior suggesting mental health problems. [DE 89-2, at 11.] Moreover, according to Dr. Saunders's deposition, A.T. was later sent to a federal medical center for a psychological evaluation. The psychologists there found that A.T. did *not* have an Axis I mental illness and was instead suffering from an Axis II personality disorder. Likewise, the psychologists concluded that A.T. did not qualify for involuntary commitment. [DE 89-2, at 15.] These contradictory opinions show just how allusive psychological diagnoses can be.

Dr. Saunders adhered to protocol and continued to try to meet with A.T. despite his opposition to psychological treatment. She upgraded his Care Level and created a treatment plan when his conditions worsened. And, even when he refused to sign his treatment plan, she continued to schedule him for appointments. It was A.T.'s right to miss these appointments as he did not, and

19

still does not, qualify for involuntary commitment. Dr. Saunders then had to rely on A.T.'s psych alert status and the observations of the general staff to monitor his conditions. Dr. Saunders, however, did not receive any negative reports concerning A.T. in the time leading up to the attack. When paired with the fact that A.T. never identified any specific victims, it was reasonable for her to believe that he did not pose a substantial risk to the other inmates. As such, Dr. Saunders actions do not constitute negligence, let alone the deliberate indifference required for the subjective component of Holder's claim.

Because Dr. Saunders's treatment of A.T. did not violate Holder's constitutional rights, it follows that Dr. King's supervision of Dr. Saunders was also not deficient. And, to the extent that Dr. King evaluated A.T. independently, the Court finds that his actions do not constitute the deliberate indifference needed to satisfy the subjective prong of the failure-to-protect analysis.

## CONCLUSION

For these reasons, the Court enters judgment in favor of defendants Dr. King and Dr. Saunders. A separate judgment will issue.

Dated October 7, 2019

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY